


**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AB:KCB
F. #2019R00436

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 4, 2019

By ECF

The Honorable Roanne L. Mann
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Matthew Lipsky
Criminal Docket No. 19-MJ-235

Dear Chief Judge Mann:

The government respectfully submits this letter in advance of a detention hearing scheduled this afternoon with respect to defendant Matthew Lipsky. The government respectfully requests that the defendant continue to be detained because he presents a significant risk of nonappearance and is a danger to the community.

The defendant was charged by complaint in the Eastern District of New York on March 15, 2019, on one count of stalking in violation of Title 18, United States Code, Section 2261A(2). On March 22, 2019, the parties appeared before the Honorable Linda K. Caracappa, Chief United States Magistrate Judge for the Eastern District of Pennsylvania, for the defendant's initial appearance on the complaint and his removal to the Eastern District of New York, pursuant to Fed. R. Crim. P. 5(c), in light of the defendant's federal arrest having occurred in the Eastern District of Pennsylvania. See Fed. R. Crim. P. 5(c)(2) (requiring initial appearance to be in district of arrest when defendant is "arrested in a district other than where the offense was allegedly committed"). At the defendant's initial appearance, the parties consented to the detention of the defendant pending his removal to the Eastern District of New York.

I. The Charged Offense[1]

In the winter of 2017, Jane Doe, an Assistant United States Attorney in the Eastern District of Pennsylvania, and the defendant met and entered into a romantic relationship. In October 2018, Jane Doe ended her relationship with the defendant after learning he maintained one or more profiles on online dating applications, and after discovering hotel receipts belonging to the defendant. Following their break-up, the defendant began sending gifts to and calling and texting Jane Doe on a daily basis. After a couple weeks of this behavior, on or about October 18, 2018, Jane Doe answered the phone and asked the defendant to stop contacting her. The defendant represented to Jane Doe that he would do so.

But the defendant did not leave Jane Doe alone. Instead, the next day, on or about October 19, 2018, a neighbor observed the defendant at Jane Doe's home, which she did not share with the defendant, and to which she had taken away the defendant's key. Jane Doe's neighbor called the police. Shortly after this incident, Pennsylvania law enforcement contacted the defendant and warned him that further unwanted correspondence with Jane Doe would result in his arrest. The defendant indicated that he understood.

However, the defendant again communicated with Jane Doe. On or about October 27, 2018, Jane Doe travelled to John F. Kennedy International Airport ("JFK") in Queens, New York, to board a flight to Dakar, Senegal. When she arrived at the departure gate at JFK, after going through security, she observed the defendant at the departure gate. The defendant handed her a letter and requested that she read it. He informed her that he had purchased a plane ticket to Senegal so that he could contact her. Jane Doe told the defendant to leave. In the letter the defendant had handed to Jane Doe, he informed her that he had purchased the "ticket next to you" on the flight to Senegal. Records from Delta Airlines confirm this.

On or about November 5, 2018, at approximately 5 a.m., Jane Doe returned to JFK from Senegal. After exiting through U.S. customs, she observed the defendant inside the airport terminal. She did not approach him, but instead walked toward a platform to board a train. The defendant followed her. Jane Doe informed him that he was stalking her, that she did not want him to communicate with her or follow her, and that she would seek legal action against him. The defendant told her he was done. But three days later, the defendant called Jane Doe and informed her he had left a bag for her on the front porch of Jane Doe's home, where Jane Doe discovered, among other things, a suicide note. She called the police, who located the defendant in the vicinity of Jane Doe's house and took him to the hospital for treatment.

Two days later, on or about November 10, 2018, Jane Doe received a telephone call from a ranch at which she and the defendant had planned to visit prior to Jane

[1] The factual recitation set forth below is, in large part, a summary of what is alleged in the complaint.

Doe's ending her relationship with the defendant. After their breakup, Jane Doe had cancelled her reservation there. However, a representative from the ranch informed her that the defendant had called the ranch to reinstate their reservation. Also during the defendant's hospitalization, he called Jane Doe and told her, among other things, that she should not have called the police.

On or about November 30, 2018, Jane Doe learned that the defendant had been released from the hospital. On or about December 22, 2018, she received a phone call from the defendant, again informing her of a contemplated suicide attempt. Jane Doe called the police, who located the defendant, who again received treatment.

On December 31, 2018, the defendant appeared in Pennsylvania state court pursuant to charges of trespass, stalking and harassment. He was released on bond. Critically, one of the conditions of his release was to have no contact, direct or indirect, with Jane Doe, and to not be within one mile of Jane Doe's home. He has violated the conditions of that bond, and he has not stayed away from Jane Doe.

Beginning in approximately December 2018, Jane Doe noticed that trash appeared to be missing from her garbage can, which she places outside of her home for pickup once per week. On or about February 11, 2019, Jane Doe contacted the police regarding footprints she observed in the snow in and around her garbage can on the curb outside of her home. February 11 would have been Jane Doe and the defendant's anniversary. Law enforcement reported that the footprints in the snow led to an area outside of an abandoned house a few doors from Jane Doe's residence.

Less than a month later, on March 2, 2019, Jane Doe observed the defendant's car drive past a park near her home (the "Park"). Jane Doe had driven her own car to the Park and had parked nearby. The next day, she was driving in her town when, while stopped at an intersection, she again observed the defendant's car drive near her own. Four days later, she again saw the defendant's car drive by the Park, where she had driven her own car. Later that same evening, she drove her car to a restaurant in her town. As she was parked in the parking lot of that restaurant, she saw the defendant's car drive past her. She observed the defendant's facial profile in the car.

The next morning, on or about March 8, 2019, Jane Doe discovered a GPS tracking device underneath her car (the "Tracking Device"). Visible on the Tracking Device was an IMEI number. Metadata obtained from the company servicing the Tracking Device lists the name "Matthew Lipsky," the defendant's phone number, the defendant's email address and the defendant's New York address as being associated with the Tracking Device. Purchase information obtained from the company servicing the Tracking Device reveals that the device was shipped to "Matthew Lipsky" to an address associated with the defendant in Malvern, Pennsylvania.

Jane Doe has changed the locks on her house. She has changed her garage door entry code. She has installed a security system in her home. She has described herself

as feeling "terrorized" by the defendant's actions. She feels scared for her own safety and for the safety of her children.

The defendant was arrested on or about March 8, 2019, pursuant to a Pennsylvania state arrest warrant for stalking. He has remained in custody since that date.

## II. The Defendant's Other Criminal Conduct

In addition to the defendant's pending state charges in connection with this case—including the defendant's violation of the no-contact order as part of the state bond—the Chester County, Pennsylvania District Attorney's office has informed the government that they are currently investigating sexual assault charges against the defendant related to an incident that allegedly occurred on March 1, 2019. Specifically, the victim ("Jane Doe 2") in that case reported chatting with the defendant on an online dating application, meeting with him in person and returning to the defendant's apartment. She reported having consensual sex with the defendant and, thereafter, refusing to consent to anal sex. She reported that the defendant nonetheless anally penetrated Jane Doe 2. She reported that she blacked out a few minutes into the assault.

The government has also learned that, in 2006, a complaint was filed with the New York City Police Department against the defendant for harassment. The victim ("Jane Doe 3") reported that, while exiting Shea Stadium, she saw her ex-boyfriend, the defendant. The defendant stated to her, in sum, "how dare you come to my stadium." He approached Jane Doe 3 and placed her in a headlock. Jane Doe 3, who thereafter moved to another state, declined to press charges against the defendant. Agents have recently spoken to an eyewitness to this incident, who confirmed the allegations made in the complaint.

## III. Legal Standard

The Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3156, "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" United States v. English, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)). Generally, the government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

The government may proceed by proffer to establish facts relevant to a detention determination. See United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v.

> LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the weight of the evidence against the defendant. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

## IV. Argument

The defendant presents a risk of flight and a substantial danger to the community, and should therefore remain in pretrial detention. His conduct—spanning a period of months, if not years—demonstrates that there are no condition or combination of conditions that can reasonably assure the safety of the community or the defendant's appearance in connection with this case.

The charged offenses are very serious. The government estimates that the defendant, even assuming he falls within the U.S. Sentencing Guidelines' (the "Guidelines") Criminal History Category I, is facing a Guidelines range of 41 to 51 months' incarceration. Moreover, the government anticipates that he will face a one-year mandatory minimum if convicted. See 18 U.S.C. § 2262(b)(6) (mandating at least one-year term of imprisonment where defendant "commits the crime of stalking in violation of," inter alia, a no-contact order). More importantly, the defendant has stalked and scared Jane Doe for months. As described above, she has felt terrorized week after week. The defendant pursued his crimes despite repeated attempts by Jane Doe and by law enforcement to persuade the defendant to stop.

The defendant did not stop. Instead, his conduct escalated. And it escalated despite criminal charges filed against him and despite a bond mandating that he not contact Jane Doe. Instead of discontinuing contact with Jane Doe, he placed a GPS tracker under her car, tracking her movements on a daily basis.

Nor does the fact that Jane Doe was not yet injured at the time of the defendant's detention weigh in favor of his release. Rather, the defendant's actions in this case, in the open sexual assault case in Chester County and dating back as far as 2006 present a deeply troubling history of violence against women. Indeed, the date that Jane Doe 2 reported being sexually assaulted by the defendant—March 1, 2019—was the same date that the defendant made a payment to the company servicing the Tracking Device.

Such actions demonstrate that the defendant presents a serious risk to the safety of the community. Moreover, the defendant's continued lack of compliance with court orders indicates that there are no set of circumstances that can assure the defendant's compliance with the terms of a bond and his appearance in the present case.

The government's evidence in this case is strong, and favors detention. The government is in possession of text messages and letters sent by the defendant to Jane Doe, as well as numerous police reports documenting the encounters between them. The government has received information from Delta Airlines and the company servicing the Tracking Device corroborating Jane Doe's statements. And a search warrant executed on the defendant's residence in Pennsylvania revealed, among other items, documents and photographs relating to Jane Doe and a retail box for the Tracking Device.

In sum, the nature of the charges in this case, the weight of the evidence against the defendant and, critically, the defendant's inability to comply with court orders and the conditions of his release in the state case, combined with his willingness to engage in criminal conduct while on release that case, all weigh heavily in favor of continued detention.

V. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will assure the defendant's return to court or the

safety of the community and therefore requests that the court order that the defendant be detained pending trial.

Respectfully submitted,

RICHARD P. DONOGHUE
Acting United States Attorney

By: /s/ Kayla Bensing
Kayla Bensing
Assistant U.S. Attorney
(718) 254-6279

cc: John F. Carman, Esq. (by E-mail and ECF)
Clerk of the Court (by E-mail and ECF)